## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **USI INSURANCE SERVICES LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action File No.** |
| | ) | |
| **ASHLEY L. TILLMAN and JOEY** | ) | _____ |
| **MONAHAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff USI Insurance Services LLC ("USI" or "Plaintiff") hereby brings the following Complaint for Injunctive Relief and Damages against Defendants Ashley L. Tillman ("Tillman") and Joey Monahan ("Monahan") (collectively, "Defendants") and respectfully states as follows:

### Nature of This Action

1.     USI brings this action against Defendants to enforce the Employment Agreements between USI and Tillman and Monahan, USI's former employees, which Defendants have violated and continue to violate in the course of their employment with Palmer & Cay, LLC ("P&C"), USI's direct competitor and Defendants' current employer. USI seeks injunctive relief against Defendants to stop

their ongoing and threatened violations of their contractual obligations and seeks monetary damages to compensate for damages that Defendants' conduct has caused USI to incur to date. USI reserves the right to amend this Complaint to assert additional claims as they may be discovered.

## Parties

2.      USI is a Delaware limited liability company registered to do business in Georgia with its principal place of business in New York. USI's sole member is USI, Inc., a Delaware corporation with its principal place of business in New York. For purposes of determining diversity jurisdiction, USI is a citizen of Delaware and New York.

3.      Tillman is an individual who is a resident of Georgia and resides and can be personally served at 255 Stonebridge Dr., Savannah, Georgia 31410. For purposes of determining diversity jurisdiction, Tillman is a citizen of Georgia.

4.      Monahan is an individual who is a resident of Georgia and resides and can be personally served at 70 Gatewood Dr., Marietta, Georgia 30068. For purposes of determining diversity jurisdiction, Monahan is a citizen of Georgia.

## Jurisdiction and Venue

5.      Jurisdiction and venue are proper in this Court under the facts and circumstances set forth herein.

6.    This Court has jurisdiction over this subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    This Court has personal jurisdiction over Defendants because they are residents of Georgia.

8.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Monahan resides in this district and all Defendants are residents of Georgia.

## Factual Allegations

### USI and the Insurance Brokerage Industry

9.    USI is one of the largest insurance brokerages in the United States and provides a full range of insurance, risk management, and other related services to thousands of clients nationwide. USI maintain offices in Atlanta, Georgia, located at 1 Concourse Parkway NE, Suite 700, Atlanta, Georgia 30328, and in Savannah, Georgia, located at 7 E Congress Street, Suite 1002, Savannah, Georgia 31401.

10.    To provide these services, USI employs sales executives, commonly referred to in the insurance industry as "Producers," and Account Executives, who are responsible for managing USI's customer relationships, including maintaining relationships with existing customers, attracting and developing new customers,

expanding current customer relationships, and planning, marketing, and developing future customer opportunities.

11.    The insurance brokerage field that USI occupies is an extremely competitive industry. An important part of USI's business is the relationships and goodwill that it forms with its clients. These relationships and goodwill are developed by hiring and training skilled personnel (including Producers and Account Executives), and through those producers identifying and satisfying client needs and otherwise developing a solid reputation in the business community. Insurance brokerage companies, like USI, invest significantly in establishing and maintaining strong relationships with their clients.

12.    USI regularly conducts repeat business with its clients. For example, when a policy is set to expire, USI works with its client to evaluate renewal options. USI also works with its clients to identify cross-selling opportunities to place other types of insurance.

13.    USI relies on its Producers and Account Executives to maintain and enhance the goodwill of USI with respect to USI's clients and relationships with prospective clients. In the course of performing their duties for USI, Producers and Account Executives have access to and gain knowledge of confidential information

about USI and its client accounts. USI also provides its Producers and Account Executives with significant training and resources as well as access to USI's clients.

14.     Consistent with this industry practice, in recognition of the importance of the relationship between employee and client, as a condition of their employment with USI, USI generally requires all its employees who develop and service insurance business to agree to certain duties owed to USI and to restrictive covenants, non-competition, non-solicitation, employee non-interference, and/or other covenants, that apply during the term of employment and for certain limited periods after the termination of employment.

## Defendants' Employment with USI

15.     In September 2014, USI offered Tillman a position of employment as an Employee Benefits Account Executive in USI's Savannah, Georgia office. Tillman accepted USI's offer and executed an Employment Agreement, agreeing to certain terms and conditions of employment. A true and correct copy of the Tillman Agreement is attached as Exhibit A.

16.     In August 2019, USI offered Monahan a position of employment as an Employee Benefits Producer in USI's Atlanta, Georgia office. Monahan accepted USI's offer and executed an Employment Agreement, agreeing to certain terms and

conditions of employment. A true and correct copy of the Monahan Agreement is attached as Exhibit B.

17.    In her capacity as an Account Executive, Tillman was regularly in contact with USI's clients, and was integral to USI's Savannah office's employee benefits insurance program. As an Account Executive, Tillman was responsible for developing, maintaining, and enhancing relationships with USI's clients and prospective clients and for assisting USI's clients in meeting their insurance needs.

18.    In his capacity as a Producer, Monahan provide employee benefits insurance brokerage services to USI's clients, including servicing USI's clients located in and around Georgia. As a Producer, Monahan was responsible for developing, maintaining, and enhancing relationships with USI's clients and prospective clients and for assisting USI's clients in meeting their insurance needs.

19.    Monahan's position of Producer was a sales position responsible for new business sales revenue growth and for existing client revenue retention and growth based upon an assigned book of prospects and clients.

20.    In his roles as Producer and Account Executive, Defendants had access to and received a substantial volume of USI's confidential information and trade secrets.

21.    Defendants have received access to a substantial volume of other information regarding USI's business operations and business strategy.

22.    This confidential information is valuable to the business of USI and could be used by competitors for their benefit and to USI's detriment.

23.    Defendants have substantial relationships with prospective and existing clients of USI, customarily and regularly solicit for USI clients and prospective clients, and customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others.

24.    During their employments at USI, Defendant have been employees who, by reason of USI's investment of time, training, money, trust, exposure to the public, or exposure to clients and other business relationships during the course of their employment with USI, have gained a high level of notoriety, fame, reputation, or public persona as USI's representative and spokesperson and have gained a high level of influence or credibility with USI's clients and other business relationships.

25.    Defendants are also in possession of selective or specialized skills, learning, or abilities and customer contacts and customer information and have obtained such skills, learning, abilities, contacts, and information by reason of having worked for USI.

### The Employment Agreements

26.    Tillman voluntarily entered into the Tillman Agreement with USI and received substantial compensation as a result of her employment with USI. By entering into the Tillman Agreement, she acknowledged and agreed that by commencing employment with USI, she received a direct financial benefit and other good and valuable consideration.

27.    In the Tillman Agreement, Tillman agreed not to "use or disclose any Confidential Information of the Company" for a period of five (5) years following termination or resignation of her employment with USI. Specifically, Section 1.2 of the Tillman Agreement states as follows:

> ***Confidentiality During and After Employment.*** The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's other terms and conditions of employment. During Employee's employment with the Company and any successor or assign, and for the five (5) year period thereafter, Employee will not use or disclose any Confidential Information of the Company, of any Predecessor or of any USI Company to which Employee had access, except (a) in the normal course of business on behalf of the Company or (b) to the extent necessary 10 comply with law or the valid order of a court of competent jurisdiction, in which event Employee shall notify the Company as promptly as practicable (and, if possible, prior to the making of such disclosure). In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person. For purposes of this Section 1.2, however, nothing shall prohibit an Employee from disclosing data or information which has been

independently developed and disclosed by others or which has otherwise entered the public domain through lawful means.

(Tillman Agreement at § 1.2 ("Non-Disclosure Covenant").) The Confidential Information that Tillman agreed not to disclose includes, among other enumerated, nonexclusive, categories of information, "the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor" and "the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of Client Accounts or Active Prospective Clients of the Company or any Predecessor[.]" (Tillman Agreement at p. 9.)

28. In the Tillman Agreement, Tillman agreed not to solicit, on behalf of a competitive business, clients and active prospective clients of USI during the term of her employment and for periods of two years and six months thereafter. In Section 2.1 of the Tillman Agreement, Tillman specifically agreed to the following:

> ***Non-Solicitation of Clients and Active Prospective Clients.*** In consideration of the payments and benefits to be received by Employee as an employee of the Company and for other good and valuable consideration, Employee agrees that:
>
> (a) Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business, whether as principal, director, shareholder, partner, agent, employee,

independent contractor, consultant, representative, lender, financier or in any other capacity:

(i) (A) solicit or attempt to solicit services in competition with the Company to any Client Account or (B) divert or attempt to divert services away from the Company with respect to any Client Account; or (C) consult for any Client Account with respect to services in competition with the Company; or (D) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (E) induce the termination, cancellation or non-renewal of any Client Account,

in each case, that Employee managed or regularly serviced on behalf of the Company or any Predecessor and/or about which Employee obtained Confidential Information on behalf of the Company or any Predecessor in the two (2) years prior to the termination of Employee's employment with the Company or its successors or assigns; and/or

(ii) (A) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; or (B) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; or (C) consult for any Active Prospective Client with respect to services in competition with the Company; or (D) sign or accept a broker of record letter with any Active Prospective Client to provide services in competition with the Company,

in each case, that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company or any Predecessor in the six (6) months prior to the termination of Employee's employment with the Company or its successors or assigns.

(b) Duration. The restrictions set forth in Section 2.1(a)(i) shall apply from the Effective Date of this Agreement until two (2) years after the effective date on which Employee is no longer employed, for any reason, by the Company, or its successors or assigns. The restrictions set forth in Section 2.1(a)(ii) shall apply from the Effective Date of this Agreement until six (6) months after the effective date on which

Employee is no longer employed, for any reason, by the Company, or its successors or assigns.

(Tillman Agreement at § 2.1 ("Non-Solicit Covenant").)

29.     In the Tillman Agreement, Tillman also agreed not to solicit or induce any other employee of USI to leave USI and work for a competitor during the term of her employment and for a two-year period thereafter. In Section 2.2 of the Tillman Agreement, Tillman specifically agreed to the following:

> ***No Interference With Employees.*** In consideration of the payments and benefits to be received by Employee as an employee of the Company, Employee agrees that Employee will not, directly or indirectly, solicit the employment, consulting or other services of, or hire, any other employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company, or otherwise induce any of such employees to leave the Company's employment or to breach an employment agreement therewith, in each case for employment or engagement by or with a Person engaged in a Competitive Business. The restrictions contained in this Section 2.2 shall apply from the Effective Date of this Agreement until two (2) years following the effective date on which Employee is no longer employed, for any reason, by the Company or its successors or assigns. Employee agrees that (i) the duration of the non-solicitation obligations hereunder shall be extended by the period of time in which Employee is in breach of those obligations and (ii) the extended duration shall be measured from the date of the court order granting injunctive relief.

(Tillman Agreement at § 2.2 ("Employee Non-Interference Covenant").)

30.     Tillman acknowledged that the purpose of the restrictions in the Tillman Agreement "is to protect the Company's assets . . . and to prevent Employee

or any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill," and she agreed "that the time, geographic and scope limitations [t]herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill." (Tillman Agreement at § 2.3.)

31.     Tillman also expressly acknowledged and agreed that the terms and conditions in the Tillman Agreement are reasonable and necessary in order to protect USI's legitimate business interests, including USI's confidential information, goodwill, ongoing business, and relationships with clients, prospective clients, and employees. (Tillman Agreement at p. 1.)

32.     Monahan voluntarily entered into the Monahan Agreement with USI and received substantial compensation as a result of his employment with USI. By entering into the Monahan Agreement, he acknowledged and agreed that by commencing employment with USI, he received a direct financial benefit and other good and valuable consideration.

33.     In the Monahan Agreement, Monahan agreed not to compete against USI with respect to certain clients and prospects during the term of his employment and for a two-year period thereafter. In Section 6.6 of the Monahan Agreement, Monahan specifically agreed to the following:

*Non-Competition With Respect to Client Accounts and Active Prospective Clients.* In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from, directly or indirectly, carrying on any business in competition with the Company in the Geographic Area with respect to any Client Account or Active Prospective Client and/or providing any services in competition with the Company to any Client Account or Active Prospective Client located in the Geographic Area. "**Carrying on any business in competition with the Company**" shall mean the sale of or providing any product or service that competes. or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or development in the most recent two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 6.6, the term "**Geographic Area**" shall mean each of the following separate and divisible geographic areas; (i) a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the most recent twelve (12) months of Producer's employment hereunder; (ii) any counties in which Producer conducted business on behalf of the Company (either by the Producer conducting business in person in that county or by directing communications, including, but not limited to, mail carrier and electronic or telephonic communications to that county) during the most recent twelve (12) months of Producer's employment hereunder; and (iii) any counties where any representatives of Client Accounts or Active Prospective Clients with whom Producer had Material Contact (as defined in Section 6.5 above) during the Producer's employment, or if after Producer's employment hereunder, in the two (2) years prior to termination of Producer's employment hereunder, are located.

(Monahan Agreement at § 6.6 ("Non-Compete Covenant").)

34.    Monahan also agreed to a Confidentiality During and Following Term

Covenant, a Non-Solicitation of Clients and Active Prospective Clients Covenant,

and a Non-Interference With Employees Covenant. (Monahan Agreement at §§ 6.2, 6.5, 6.7.)

35.     In the Monahan Agreement, Monahan expressly acknowledged and agreed that the terms and conditions in the Monahan Agreement are reasonable and necessary in order to protect USI's legitimate business interests, including USI's confidential information, goodwill, ongoing business, and relationships with clients, prospective clients, and employees. (Monahan Agreement at p. 2.)

36.     Additionally, in Section 6.8 of the Monahan Agreement, Monahan expressly agreed that the time, geographic area, and scope of the limitations contained in the Monahan Agreement are reasonable and necessary to protect USI's confidential information and goodwill.

### Defendants' Resignations and Improper Competition

37.     Monahan resigned from USI effective January 2021.

38.     Soon thereafter, Monahan became employed by and began to perform employee benefits insurance brokerage services on behalf of P&C, a direct competitor of USI, based out of P&C's Atlanta, Georgia office, located at 3050 Peachtree Road NW, Suite 475, Atlanta, Georgia 30305.

39.     On June 27, 2022, without providing any advance notice, Tillman abruptly and unexpectedly resigned her employment with USI, effectively

immediately. A true and correct copy of the Tillman Resignation Letter is attached hereto as Exhibit C.

40.    Almost immediately after announcing her resignation, but no later than June 28, 2022, Tillman updated her LinkedIn profile to reflect her employment as a Senior Account Executive at P&C in Savannah, Georgia.

41.    Also on June 27, 2022, almost simultaneous with USI's receipt of the Tillman Resignation Letter, Frank Garrison, an Employee Benefits Producer employed with USI in its Savannah, Georgia office, attempted to resign his employment with USI, effective immediately.

42.    Because Garrison's employment agreement with USI contains a provision requiring him to provide USI with at least 60 days' advance notice in order to effectively terminate his employment, Garrison's attempted immediate resignation was not effective as of June 27, 2022.

43.    Garrison and Tillman were integral to the structure of USI's Savannah office's employee benefits insurance program and worked closely together to provide comprehensive assistance and services to USI's clients.

44.    As of June 27, 2022, Tillman and Garrison were two of only four employee benefits insurance personnel working in USI's Savannah office, and Garrison was the only employee benefit Producer.

45.    After receiving Garrison's attempted resignation email, Brian McNulty, Employee Benefits Practice Leader for USI's Southeast Region, had a conversation with Garrison during which Garrison stated that both he and Tillman were immediately joining P&C.

46.    P&C, a "Competitive Business" as defined in the Employment Agreements, competes with USI throughout Georgia, including in the Atlanta and Savannah areas.

47.    On information and belief, after and likely before Tillman resigned from USI, she began, on behalf of P&C, to, directly or indirectly, solicit, divert, induce the termination of the business of one or more USI Client Accounts that she had serviced as an Account Executive for USI.

48.    On July 13, 2022, Fuji Vegetable Oil, Inc. notified USI that it was terminating its relationship with USI and changing its broker of record to P&C. Fuji Oil is a USI Client Account, as defined in the Employment Agreements, that Tillman managed and serviced on behalf of USI.

49.    On July 21, 2022, USI received a broker of record change letter providing notice that Roger Woods Food, Inc. was transferring its insurance brokerage relationship away from USI effective July 7, 2022. Roger Wood Foods is

a USI Client Account, as defined in the Employment Agreements, that Tillman managed and serviced on behalf of USI.

50.     On July 21, 2022, USI received a broker of record change letter providing notice that Grayco was transferring its insurance brokerage relationship away from USI effective July 21, 2022. Grayco is a USI Client Account, as defined in the Employment Agreements, that Tillman managed and serviced on behalf of USI.

51.     The substantive language of the Roger Wood Foods and Grayco letter was identical suggesting the letter was drafted by Tillman or another employee of P&C.

52.     The Fuji Oil, Roger Wood Foods, and Grayco accounts generated well over $75,000 in revenue for USI in the twelve months preceding Tillman's resignation.

53.     A senior Fuji Oil representative informed USI that Fuji Oil purportedly decided to transfer its business to P&C due to a presentation Monahan gave in July 2021 soliciting their business. Fuji Oil claimed that it planned to work with Monahan's team when it transferred its business to P&C.

54.     By servicing Fuji Oil on behalf of P&C while working out of P&C's Atlanta office, Monahan is carrying on business in competition with USI in the

Geographic Area with respect to a Client Account within two years after the termination of his employment with USI, in violation of the Non-Compete Covenant. USI reasonably believes that such conduct will continue absent judicial intervention.

55.    Additionally, that Fuji Oil terminated its decade-plus long relationship with USI and transferred its business to P&C a mere 16 days after Tillman, their long-standing USI Account Executive, tendered her immediate resignation from USI to accept employment at P&C, suggests that Tillman may have also been involved in contractually prohibited direct or indirect solicitation of Fuji Oil's business.

56.    The subsequent additional departures of Roger Wood Foods and Grayco heightened USI's concerns that Tillman is breaching her contractual covenants.

57.    Prior to initiating litigation, USI, through counsel, raised its concerns regarding the suspicious departures of Fuji Oil, Roger Wood Foods, and Grayco with P&C through its counsel.

58.    In direct contradiction to the statement of Fuji Oil's representative that it transferred its business to work with Monahan based on a presentation Monahan gave a year ago, P&C, through counsel, stated that Fuji Oil transferred its business

due to solicitation by P&C's CEO Jack Cay and stated it was "not aware of anyone else at Palmer & Cay who initiated contact with Roger Woods Foods or Fuji Oil[.]"

59.     These conflicting explanations relating to the transfer of Fuji Oil's account coupled with the suspicious timing of the transfers raise significant doubt about P&C's denial that Tillman was involved in soliciting these USI Client Accounts.

60.     Additionally, according to P&C, on June 29, 2022 (a mere two days after she submitted her resignation to USI and shortly after she changed her LinkedIn profile notifying her contacts of her employment with P&C) a Grayco employee called Tillman's cell phone and asked for Tillman's P&C contact information; Tillman gave the employee her P&C email address; the Grayco employee then emailed Tillman at her P&C email address to discuss moving Grayco's insurance business to P&C; and Tillman forwarded that request to Jack Cay who responded. These admitted actions alone evidence direct and/or indirect conduct by Tillman on behalf of P&C to solicit USI's Client Accounts, divert USI's Client Accounts away from USI, and/or induce USI's Client Accounts to terminate their relationship with USI in violation of Tillman's Non-Solicit Covenant.

61.     Based on the above circumstances, USI reasonably believes that Tillman has solicited or otherwise diverted, attempted to divert, or induce the

termination of Grayco, and, potentially Fuji Oil, Roger Wood Foods, and more USI Client Accounts. USI also reasonably believes that Tillman has used or will use her knowledge of Confidential Information regarding additional Client Accounts she serviced at USI, including information regarding expiration dates and the timing of insurance needs, to solicit or divert the business of additional Client Accounts when USI's relationships with such Client Accounts are most vulnerable. USI reasonably believes that such conduct will continue absent judicial intervention.

62.     As a direct result of Defendants' improper conduct, USI has already suffered damages.

63.     USI is now in a vulnerable position with the potential for continued loss of business and harm to its goodwill due to Defendants' improper actions. The wholesale damage to USI, however, cannot be quantified as to the transfer of Client Accounts to a Competitive Business precipitated by one having detailed knowledge of confidential, proprietary, and trade secret information belonging to USI regarding these (and other) customers. Defendants' actions have diminished (and will continue to diminish) USI's position in the marketplace and undermine its goodwill.

64.     Defendants agreed in the Employment Agreements that the services they rendered to USI were "of a special, unique, and extraordinary character," that "it would be extremely difficult or impracticable to replace such services," and that

any breach of the restrictive covenants contained in the Employment Agreements "would result in irreparable harm to the business of [USI] for which money damages alone would not be adequate compensation." Defendants agreed that, in addition to any other rights or remedies available at law, USI would be entitled to equitable relief, including, without limitation, a temporary and permanent injunction, in the event Defendants violated the restrictive covenants in the Employment Agreements. (Tillman Agreement at § 4; Monahan Agreement at § 8.)

65.     Defendants' conduct has caused and threatens irreparable harm to USI for which USI has no adequate remedy at law. If Defendants are not enjoined from their unfair competition, USI will suffer continuing, additional, and irreparable harm.

## Count One
### Breach of Non-Compete Covenant
### (Against Monahan)

66.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 65.

67.     The Monahan Agreement is a valid and enforceable contract and was in place at the time Monahan voluntarily resigned from his employment with USI.

68.    The Non-Compete Covenant contained in Section 6.6 of the Monahan Agreement is reasonable and necessary to protect the legitimate business interests of USI.

69.    As set forth above, in the Non-Compete Covenant, Monahan agreed, among other things, to refrain from carrying on any business in competition with USI in the Geographic Area with respect to Client Accounts for a period of two years after his employment ended.

70.    Monahan has breached the Non-Compete Covenant by within two years of the termination of his employment with USI providing within 100 miles of USI's Atlanta office products and services to Fuji Oil on behalf of P&C that compete, and are reasonably anticipated to compete, in the same markets, with products and services of USI.

71.    As a result of Monahan's improper competition, USI has suffered, and is likely to continue to suffer, substantial injury, including in the form of lost business opportunities, lost profits, and damage to USI's goodwill from its employees, clients, and potential clients.

72.    Accordingly, USI is entitled to preliminary and permanent injunctive relief prohibiting Monahan from continuing to breach his non-competition

obligations in the Monahan Agreement and is entitled to an award of monetary damages in an amount to be proven at trial.

**Count Two**
**Breach of Non-Solicit Covenant**
**(Against Tillman)**

73.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 65.

74.     The Tillman Agreement is a valid and enforceable contract and was in place at the time Tillman voluntarily resigned from her employment with USI.

75.     The Non-Solicit Covenant contained in Section 2.1 of the Tillman Agreement is reasonable and necessary to protect the legitimate business interests of USI.

76.     As set forth above, in the Non-Solicit Covenant, Tillman agreed, among other things, to refrain from indirectly or directly soliciting, diverting, and/or inducing the termination of certain Client Accounts of USI for a period of two years after her employment ended.

77.     Tillman announced her resignation from USI on June 27, 2022, updated her LinkedIn profile to notify her business connections of her new employment with P&C on June 28, 2022, spoke on her personal cell phone with a Grayco employee on June 29, 2022, gave that Grayco employee her P&C email address, received an

email from that Grayco employee at her P&C email address regarding moving Grayco's insurance business to P&C, and forwarded that request to Jack Cay. Then, within less than a month of Tillman's departure from USI, Grayco terminated its relationship with USI and transferred its business to P&C.

78.     The information available to USI, including the foregoing, indicates that Tillman has breached the Non-Solicit Covenant by, among other things, indirectly or directly soliciting, diverting, or inducing the termination of, (or attempting to solicit, divert, or induce the termination of) business of one or more Client Account that she serviced while working for USI in competition with USI.

79.     Specifically, Tillman's admitted affirmative action of coordinating the discussion between P&C's CEO and Grayco so that P&C could encourage and facilitate the transfer of Grayco's business constitutes prohibited conduct under the language of the Non-Solicit Covenant.

80.     As a result of Tillman's improper solicitation and diversion of Grayco's business, USI has suffered, and is likely to continue to suffer, substantial injury, including in the form of lost business opportunities, lost profits, and damage to USI's goodwill from its employees, clients, and potential clients.

81.     Accordingly, USI is entitled to preliminary and permanent injunctive relief prohibiting Tillman from continuing to breach her non-solicitation obligations

in the Tillman Agreement and to an award of monetary damages in an amount to be proven at trial.

## Count Three
### Attorneys' Fees

82.    USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 81.

83.    Defendants have acted in bad faith, been stubbornly litigious, and has caused USI unnecessary trouble and expense in refusing to honor their valid contractual obligations to USI.

84.    As a result of Defendants' wrongful conduct described herein, pursuant to O.C.G.A. § 13-6-11, USI is entitled to its costs and expenses, including reasonable attorneys' fees.

## Request for Preliminary and Permanent Injunctive Relief

85.    USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 84.

86.    As set forth above, Defendants have breached and are breaching their contractual non-competition and non-solicitation obligations to USI.

87.    Defendants' conduct in actively competing with USI and soliciting USI's Client Accounts demonstrates that, if not enjoined, Defendants likely to continue to cause USI substantial and irreparable harm.

88.     More specifically, as described above, Defendants are actively in the process of transferring at least three USI Client Accounts from USI to P&C. The transfer of at least one of these accounts, Grayco, was effectuated by the efforts of Tillman. And at least one of these accounts, Fuji Oil, is to be serviced by Monahan.

89.     USI does not have an adequate remedy at law for the harm Defendants have already caused and are likely to continue to cause, including the loss of and damage to the goodwill of USI's employees, clients, and potential clients. The amount of such damages would be significant, but difficult to determine specifically.

90.     Defendants agreed in the Employment Agreements that, under the present circumstances, USI is entitled to injunctive relief in order to enforce the restrictive covenants in the Agreement. (Tillman Agreement at § 4; Monahan Agreement at § 8.)

91.     The public interest will not be harmed if an injunction is granted.

92.     Accordingly, USI is entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to breach the Non-Compete Covenant and the Non-Solicit Covenant.

## Jury Trial Demand

USI demands a jury trial on all issues on which the law entitles it to a trial by jury.

## **Prayer for Relief**

WHEREFORE, USI respectfully requests the following relief:

(a)     That the Court enter judgment in favor of USI and against Defendants on all counts in an amount to be determined at trial and award damages to USI, including, but not limited to, compensatory damages, attorneys' fees, costs, and interest;

(b)     That the Court enter an injunction against Defendants requiring compliance with the Employment Agreements, including (i) barring Tillman from, directly or indirectly, soliciting, diverting, or inducing the termination of the business of any Client Account that she managed or regularly serviced on behalf of USI in the two years prior to June 27, 2022, and (ii) barring Monahan from competing with USI within the Geographic Area with respect to any Client Account and from providing services in competition with USI to any Client Account located in the Geographic Area, as those capitalized terms are defined in the Employment Agreements; and

(c)     That the Court award such other and further relief as it deems just and proper.

Respectfully submitted this 3rd day of August, 2022.

**PARKER HUDSON RAINER & DOBBS LLP**

*/s/ Nancy H. Baughan*
Nancy H. Baughan
Georgia Bar No. 042575
John H. Elliott
Georgia Bar No. 350612
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia 30303
Phone: (404) 523-5300
Fax: (404) 522-8409
nhb@phrd.com; jell@phrd.com

*Counsel for USI Insurance Services LLC*